# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## Case No. 15-cv-61446-BLOOM/Valle

CIRCUITRONIX, LLC,

      Plaintiff,

v.

SUNNY KAPOOR,

      Defendant.

_____/

SUNNY KAPOOR

      Counter-Plaintiff,

v.

RISHI KUKREJA and
CIRCUITRONIX, LLC,

      Third Party and Counter-Defendants.

_____/

# FINAL ORDER ON
# CROSS-MOTIONS TO ENFORCE SETTLEMENT AGREEMENT

    **THIS CAUSE** is before the Court on Defendant Sunny Kapoor's ("Kapoor" or "Defendant") Motion to Enforce Confidential Settlement Agreement and Permit Limited Discovery Regarding Potential Additional Breaches, ECF No. [50] ("Kapoor's Motion"), and Plaintiff Circuitronix, LLC's ("Circuitronix" or "Plaintiff") Cross-Motion to Enforce Settlement Agreement, ECF Nos. [55], [56] ("Circuitronix's Cross-Motion") (collectively, the "Cross-Motions"). The Court held an initial evidentiary hearing on December 8, 2016 and a final evidentiary hearing on April 24, 2017 and April 26, 2017, and heard final closing arguments from the parties on May 26, 2017. The Court has thoroughly considered all of the arguments raised (both oral and written), the documents submitted during the evidentiary hearings, and

other evidence of record as appropriate. For the reasons that follow, the Cross-Motions are denied.

## I. BACKGROUND

### 1. The Underlying Action and Settlement

This dispute stems from a falling out between Circuitronix—particularly its Chief Executive Officer, Rishi Kukreja ("Kukreja")—and Kapoor, a former employee of Circuitronix. Circuitronix is a company that, among other things, manufactures and distributes various metal parts for several industries, including the automotive, industrial, lighting, and security systems industries. The bulk of Circuitronix's business involves printed circuit boards (or "PCBs") and printed circuit board assembly ("PCBA"). As an elementary background, PCBs are used as an essential component in almost all finished electronic products, and PCBA is the process of assembling electronic components to PCBs. *See* ECF No. [100] at 67-71. Kapoor served as the Assistant Chief Executive Officer of Circuitronix from October of 2012 until his employment was terminated in March of 2015. In that capacity, Kapoor operated out of Circuitronix's office in Hong Kong. Kapoor's employment as Assistant CEO of Circuitronix was subject to a series of employment agreements. *See* ECF Nos. [1-1]-[1-2]. Following Kapoor's termination, on July 13, 2015, Circuitronix initiated the underlying suit against Kapoor, asserting claims for the dissemination of Circuitronix's proprietary information, self-dealing and other breaches of Kapoor's employment agreements and fiduciary duties. In response to Circuitronix's suit, Kapoor filed a counterclaim against Circuitronix and Kukreja, asserting claims for breach of employment contract, unlawful retaliation, civil theft, and unpaid wages.

On December 1, 2015, after having resolved all disputed claims asserted against one another at mediation, the parties signed a "Mediated Settlement Term Sheet." *See* ECF No. [67].

The Mediated Settlement Term Sheet provided a "general release of all claims by the parties against one another, known or unknown, existing or inchoate, based on any conduct or occurrence prior to and including the date that the Settlement Agreement and General Release is executed . . . ." *Id.* at ¶ 7. The Mediated Settlement Term Sheet also provided that the general release applied to "any agent, affiliate or shareholder of the parties." *Id.* In consideration for the general release, Kapoor was required to provide Circuitronix with a sworn affidavit disclosing all activities in which he was engaged prior to December 1, 2015 that could potentially constitute violations of any provisions of his employment agreements. *Id.* at ¶ 3.

On December 15, 2015, Kapoor provided the sworn affidavit required by the Mediated Settlement Term Sheet, *see* ECF No. [47-1], and the parties entered into a final Settlement Agreement and General Release ("Settlement Agreement") that set forth the terms of the parties' agreement to resolve their respective claims, *see* ECF No. [53]. As agreed upon, Kapoor recounted in his sworn affidavit recent actions of his that he believed could potentially relate to certain provisions of his employment agreements. Regarding an "exclusive employment provision," in January of 2015 Kapoor assisted his wife, Payal Bawa, in forming a company in Hong Kong named Imaginasian Ltd. ("Imaginasian Hong Kong"), the initial purpose of which was for his wife to establish "freelancing business in addition to exploring other opportunities." ECF No. [47-1] at ¶ 9(b). Following his termination from Circuitronix, Kapoor actively worked for Imaginasian Hong Kong after deciding to use the company for "sourcing metal parts" for his father-in-law's, Chand Bawa, metal and mechanical parts business named Bawa Machine and Tool Manufacturing ("BMTM"). *Id.* Kapoor assured that none of the potential suppliers for his father-in-law's business that Kapoor had met with up to that point were suppliers, customers or competitors of Circuitronix. Kapoor also represented that none of his meetings related to any

product manufactured or sold by Circuitronix. *See id.* at ¶¶ 9(c)-(b). Similarly, Kapoor assured that the metal parts he was helping his father-in-law source were not parts manufactured or sold by Circuitronix or parts that were in any way related to parts manufactured or sold by Circuitronix. *Id.* at ¶ 9(e). Kapoor currently remains the general manager and sole employee of Imaginasian Hong Kong; Kapoor's wife's involvement with Imaginasian Hong Kong ceased in March of 2015. Kapoor also disclosed in his sworn affidavit a second company he was actively working for at the time, Imaginasian Equipments Pvt. Ltd. ("Imaginasian India"), which his father formed in India in August of 2015 in order to "facilitate sourcing of equipment used in the hospitality Industry . . . ." *Id.* at ¶ 9(f). Kapoor assured that none of the products Imaginasian India did business with were related to any products manufactured or sold by Circuitronix. *Id.* Kapoor further specified that Imaginasian India was "establishing sale of consumer Electronics in India, including Power Supply products, IOT devices and other consumer electronics[,]" and was "undertaking design projects for high end IOT consumer electronics." *Id.* Regarding certain restrictive covenants, Kapoor acknowledged that the restrictive covenant prohibiting him from competing with Circuitronix was binding for a period of three years starting on September 15, 2015 and "applie[d] to all lines of business in which Circuitronix engages . . . ." *Id.* at ¶ 11. Kapoor assured in his sworn affidavit that he had not taken any actions that would constitute competition with Circuitronix and that he had not solicited customers or employees of Circuitronix. *Id.* at ¶¶ 11-12.

The final Settlement Agreement the parties entered into the same day incorporated by reference the Mediated Settlement Term Sheet and was formally approved by the Court on December 17, 2015. ECF No. [44]. Similar to the restrictive covenants that Kapoor addressed in his December 15, 2015 sworn affidavit, the Settlement Agreement contains restrictive covenants

prohibiting Kapoor from competing with Circuitronix. In particular, paragraph 3 of the Settlement Agreement provides in relevant part: "Defendant shall not (individually, or as an officer, director, partner, shareholder, agent or affiliate) compete with Circuitronix, anywhere in the world, for a period of 3 years starting from September 15, 2015. Defendant acknowledges that this restriction applies to all *lines of business* in which Circuitronix engaged during the time period Defendant was employed by Circuitronix . . . ." ECF No. [53] at ¶ 3 (emphasis added). Additionally, pursuant to paragraphs 4 and 5 of the Settlement Agreement, Kapoor shall not "solicit, recruit, or attempt to hire any employee, officer, director, shareholder or agent of Circuitronix or any of its vendors, customers or affiliates[,]" or "have any contact that he initiates and/or was planned, with any suppliers, customers or employees of Circuitronix . . . ." *Id.* at ¶¶ 4-5. And, consistent with the general release in the Mediated Settlement Term Sheet, paragraph 9 of the Settlement Agreement provides a general release, which states in relevant part: "Plaintiffs . . . do hereby release and forever discharge and hold harmless Defendant . . . from any and all . . . claims . . ., known or unknown, which they ever had, now had, or shall or may have in the future . . . on account of events that occurred on or before the date of this Settlement Agreement and General Release." *Id.* at ¶ 9.

### 2. Circuitronix's First Motion to Enforce and the Parties' Subsequent Cross-Motions

Shortly after the Court's approval of the Settlement Agreement, on December 30, 2015, Circuitronix filed its first motion for enforcement of the Settlement Agreement, claiming that Kapoor was competing directly with Circuitronix through work he was performing at the time for BMTM, his father-in-law's metal parts company. *See* ECF No. [45]. That motion was quickly resolved when the parties filed a Joint Stipulation on January 22, 2016, which specifically provided, *inter alia*, that "[p]ursuant to the Parties' Settlement Agreement, Kapoor

shall not, directly or indirectly, engage in any line of Circuitronix's business, including within the scope of his work with [BMTM]." ECF No. [48]. The Joint Stipulation also identified certain metal parts that Kapoor's work with BMTM did not involve. *See id.* at 2 n.1.

A few months later, in April of 2016, Kukreja discovered a website operated by Imaginasian Hong Kong (the "Imaginasian Website") which, based on its content, led Kukreja to believe that either Imaginasian Hong Kong or Imaginasian India (or both) (collectively, "Imaginasian") were directly competing with Circuitronix. Of particular concern to Kukreja was the Imaginasian Website's marketing and advertising of two product lines, "Electronics" and "Mechanics." Thereafter, on August 1, 2016, Circuitronix sent letters to two companies through which it was suspected that Imaginasian was competing with Circuitronix, BMTM and Koala Holdings, LLC ("Koala Holdings")—a company owned by Kapoor's brother-in-law, Rohit Bawa. *See* ECF Nos. [50-1]-[50-2]. Among other things, the letters notified both companies of the existence of the Settlement Agreement between Circuitronix and Kapoor and Kapoor's obligation thereunder not to compete with Circuitronix.

Based on the above mentioned letters, Kapoor filed his Motion on September 9, 2016, arguing that the letters violated the Settlement Agreement's confidentiality and non-disparagement clauses[1] and requesting, *inter alia*, that he be granted limited discovery to determine if Circuitronix had sent any additional violative letters to third parties. *See* ECF No. [50]. In response, Circuitronix filed its Cross-Motion on September 26, 2016, relying in part on the Imaginasian Website to allege that Kapoor was materially breaching the Settlement

---

[1] Paragraph 13 of the Settlement Agreement prohibits the parties from taking any "action which is intended, or would reasonably be expected, to harm each other's reputations or which would reasonably be expected to lead to unwanted or unfavorable publicity." ECF No. [53] at ¶ 13. Paragraph 21 of the Settlement Agreement deems "[a]ll information contained in and provided pursuant to" the Settlement Agreement as confidential information and mandates that the parties "take reasonable steps to ensure that such confidential information is not disclosed or disseminated to third parties or the public." *Id.* at ¶ 21.

Agreement—namely, by directly competing with Circuitronix's line of business through a series of related companies operated by himself and members of his family, including Imaginasian, BMTM, and Koala Holdings. *See* ECF No. [55]. Circuitronix also requested limited discovery in order to seek additional evidence of Kapoor's alleged breach of the Settlement Agreement. *See id.*

### 3. The Initial Evidentiary Hearing on December 8, 2016 and the Court's December 16, 2016 Order

The Court held an initial evidentiary hearing on the Cross-Motions on December 8, 2016. Much of the hearing was dedicated to ascertaining how the parties intended the Circuitronix's 'line of business' term to be interpreted under the Settlement Agreement, as the parties had been unable to reach a consensus on the undefined term—critical as it was to Circuitronix's Cross-Motion. *See* ECF No. [73] at 8. The parties submitted extensive documentation to support their respective positions on the issue.

The remainder of the hearing focused on the Imaginasian Website, *see* Pl. Exhs. 15-27, which Kapoor admitted to creating and maintaining. In particular, Circuitronix directed the Court's attention to the Imaginasian Website's "Electronics" and "Mechanics" pages. The Electronics page prominently displays PCBs and PCBAs and describes Imaginasian as having "long been serving automotive, industrial, security, medical and consumer electronics industry [sic]." Pl. Exh. 17. According to Circuitronix, this advertisement mirrors what is advertised as Circuitronix's PCB-related specialty on Circuitronix's website. *See* ECF No. [95] at 4. The Imaginasian Website's Mechanics page advertises certain metal parts and manufacturing processes that Circuitronix claimed overlapped with its metals business and that Kapoor had previously denied working with in the parties' January 22, 2016 Joint Stipulation. *See* Pl. Exh. 17; ECF No. [48] at 2 n.1. Circuitronix argued that the Imaginasian Website clearly

demonstrates that Kapoor has been competing in Circuitronix's yet-to-be-defined line of business.

Following the initial evidentiary hearing, on December 16, 2016, the Court entered an Order defining Circuitronix's line of business for purposes of the Settlement Agreement as "the manufacturing and distribution of: (1) printed circuit boards, including rigid, rigid-flex, flex and/or metal clad; (2) plastic injection molded parts, including single shot, multi shot, gas assist molding, foam molding, vertical molding, overmolding, and insert molding; (3) compression and injection rubber parts, including silicone rubber keypads, gaskets, grommets, and elastomer strips; (4) metal parts, including stamped sheet metal parts, CNC sheet metal parts, die casting, extrusions, heatsinks, tool and die manufacturing for plastic injection molded parts, printed circuit boards, die casted parts, stamped parts, and cabinet locks; (5) printed circuit board assembly, including through hole, SMT, BGA, and COB; and (6) polymer thick film technology for different laminate substrates, including CEM-1, FR4, CEM-3, FR2 and ceramic." ECF No. [73] at 12-13. Having defined Circuitronix's line of business, the December 16, 2016 Order allowed Circuitronix limited discovery going forward to determine whether Kapoor materially breached the Settlement Agreement by competing in that line of business or "by otherwise violating the restrictive covenants found under paragraphs 4 or 5 of the Settlement Agreement." *Id.* at 15. With respect to relief, the Court held that Circuitronix would not be permitted to seek damages (including liquidated damages) for Kapoor's alleged breach of the Settlement Agreement. *See id.* at 13-15. Instead, the Court explained that it would only consider Circuitronix's Cross-Motion "insofar as it seeks injunctive relief" because Circuitronix failed to

meaningfully comply with the conferral requirements under Local Rule 7.1(a)(3) before filing the Cross-Motion.[2]  *Id.* at 15.

Regarding Kapoor's Motion, the Court held in the December 16, 2016 Order that the two letters Circuitronix sent to BMTM and Koala Holdings did not violate the confidentiality or non-disparagement clauses of the Settlement Agreement, and therefore denied Kapoor's Motion to that extent.  However, the Court allowed Kapoor limited discovery to determine whether other third-party communications that Circuitronix had apparently sent out violated the Settlement Agreements' confidentiality and non-disparagement clauses.  *Id.* at 6-7, 15.  Finally, the December 16, 2016 Order scheduled a final evidentiary hearing in order to fully resolve the Cross-Motions.

### 4.  The Final Evidentiary Hearing on April 24, 2017 and April 26, 2017

At the final evidentiary hearing that took place on April 24, 2017 and April 26, 2017, much of the focus with respect to Circuitronix's Cross-Motion was on Imaginasian India and a company named Ei EMS India Private Limited ("Ei EMS")—in particular, Kapoor's affiliation with those companies and their work related to PCBs and PCBAs.  The evidence presented at the

---

[2] Local Rule 7.1(a)(3) provides, in part, that:

> Prior to filing any motion in a civil case, [with certain limited exceptions], counsel for the movant shall confer (orally or in writing), or make reasonable effort to confer (orally or in writing), with all parties or non-parties who may be affected by the relief sought in the motion in a good faith effort to resolve by agreement the issues to be raised in the motion. . . . At the end of the motion, and above the signature block, counsel for the moving party shall certify either: (A) that counsel for the movant has conferred with all parties or nonparties who may be affected by the relief sought in the motion in a good faith effort to resolve the issues raised in the motion and has been unable to do so; or (B) that counsel for the movant has made reasonable efforts to confer with all parties or nonparties who may be affected by the relief sought in the motion, which efforts shall be identified with specificity in the statement . . ., but has been unable to do so. . . . Failure to comply with the requirements of this Local Rule may be cause for the Court to grant or deny the motion . . . .

S.D. Fla. L.R. 7.1(a)(3).

hearing[3] reflected that Ei EMS was formed on September 29, 2016 as a joint venture and subsidiary of Imaginasian India and a company named EOS Power India Private Limited ("EOS Power")—a supplier of Imaginasian India whose corporate filings reflect that the company's work involves PCBs as well as PCBAs. One of the appointed directors of Ei EMS is Kapoor's mother, Asha Kapoor, who also serves as Ei EMS's Imaginasian India representative. Like EOS Power, Ei EMS's corporate filings reflect that it too is a PCB and PCBA company. For example, Ei EMS's Memorandum of Association indicates that the company's object is to "deal in all kinds of electronic assemblies, equipment, components, devices and appliances." Pl. Exh. 60 at CTX1008.

Kapoor offered testimony denying any official role with Ei EMS, and there is no direct evidence that he has any ownership stake in, or was ever officially employed by, Ei EMS. *See, e.g.*, Pl. Exh. 86. Kapoor also denied having any part in Ei EMS's dealings with third-party companies. Nevertheless, evidence of considerable involvement between Kapoor and Ei EMS was presented such that the Court will, for purposes of the Settlement Agreement, attribute the company's activities to Kapoor while Kapoor worked for, and continued to remain active with, Imaginasian India—one of Ei EMS's parent companies. Kapoor testified that he stopped working with Imaginasian India sometime prior to September of 2016 in order to focus on his work with Imaginasian Hong Kong. But before doing so, Kapoor testified that he and his father discussed the formation of Ei EMS as a subsidiary of Imaginasian India in order to develop a PCBA factory. After the development of the Ei EMS factory, and even after Kapoor stopped

---

[3] Kapoor objected (and has maintained objection) to the admission of much of that evidence—namely, various corporate records, website pages, and video evidence, *see* ECF No. [105] (Circuitronix's request for admission of Pl. Exhs. 11-13, 29, 38-59, 61-117, 119-127, 130-150, 153-155, 158, 193-200, 231-236, 240-241)—on authenticity, hearsay, and relevance grounds. *See* ECF No. [104] at 2-3; ECF No. [106]. After careful consideration, Kapoor's objections are overruled and Plaintiff's Exhibits 11-13, 29, 38-59, 61-117, 119-127, 130-150, 153-155, 158, 193-200, 231-236, 240-241 are admitted into evidence.

working for Imaginasian India in an official capacity, Kapoor visited the Ei EMS factory on eight to ten occasions in 2017, and during those visits engaged in business-related discussions with managing members of Ei EMS and EOS Power. On one occasion, a private investigator hired by Circuitronix spoke with an individual at the Ei EMS factory who identified himself as an engineer for Ei EMS and, when asked, identified Kapoor as the "boss" of Ei EMS.[4] *See* Pl. Exh. 231.

As to the work performed by Ei EMS, Circuitronix's investigative efforts also revealed the presence of PCBA machinery and workers assembling PCBAs within the Ei EMS factory. *See* Pl. Exhs. 223-231. Similarly, Ei EMS's website touts the company's efforts in the PCBA industry, including its "bare assemblies and sub-assemblies" capabilities. Pl. Exh. 240. Circuitronix argued that Ei EMS's work related to PCBAs clearly constituted competition with Circuitronix's line of business and thereby established that Kapoor had violated the Settlement Agreement.

At the conclusion of the hearing, the parties also addressed Kapoor's Motion. Kapoor conceded that the additional letters Circuitronix had sent out to third parties, which were produced during the parties' limited discovery, do not violate the Settlement Agreements' confidentiality and non-disparagement clauses. Kapoor nevertheless requested that the Court issue an injunction requiring that all future written correspondence from Circuitronix regarding Kapoor be in the same form as the newly discovered letters (as opposed to the two letters Circuitronix sent to BMTM and Koala Holdings on August 1, 2016). As mentioned, however, the Court has already denied Kapoor's Motion to the extent that Kapoor is unable to present

---

[4] Circuitronix also presented bank statements of Imaginasian India reflecting that Imaginasian India had made payments to Kapoor (totaling in the thousands of U.S. dollars) throughout the fourth quarter of 2016 (after the formation of Ei EMS) and into early 2017. *See, e.g.*, Pl. Exh. 129 at CTX473, CTX 475, CTX477.

evidence of communications beyond the initial letters sent to BMTM and Koala Holdings that violate the confidentiality and non-disparagement provisions. There admittedly being no such evidence, there simply is no occasion—i.e., breach of the Settlement Agreement—for the Court to issue the specific injunction requested by Kapoor. As such, the only remaining issue before the Court is whether Kapoor has materially breached the Settlement Agreement as alleged in Circuitronix's Cross-Motion.

## II. LEGAL STANDARD

A federal court has jurisdiction to enforce a settlement agreement even after a suit has been dismissed where, as here, the court specifically retained authority to do so in its dismissal order. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 380-82 (1994). The construction and enforcement of a settlement agreement is governed by state law applicable to contracts in general. *Hayes v. Nat'l Serv. Indus.*, 196 F.3d 1252, 1254 (11th Cir. 1999); *Blum v. Morgan Guar. Tr. Co. of N.Y.*, 709 F.2d 1463, 1467 (11th Cir. 1983); *see also Conte v. Winn Dixie Stores, Inc.*, 2014 WL 4693072, at *2 (N.D. Fla. Sept. 22, 2014) ("A motion to enforce [a] settlement agreement essentially is an action to specifically enforce a contract . . . ."). Here, the parties agree that Florida law governs the Cross-Motions. *See generally BP Prods. N. Am., Inc. v. Oakridge at Winegard, Inc.*, 469 F. Supp. 2d 1128, 1133 (M.D. Fla. 2007) ("In Florida, settlement agreements are favored as an efficient way to settle disputes and as a means to conserve judicial resources[,]" and "[c]ourts will enforce them when it is possible to do so."). For purposes of a breach of contract claim, Florida contract law requires that a material breach of a settlement agreement—i.e., the contract—be established by a preponderance of the evidence. *Vega v. T–Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009); *Knowles v. C.I.T. Corp.*, 346 So. 2d 1042, 1043 (Fla. 1977).

## III. ANALYSIS

Based on the written and oral arguments made by Circuitronix leading up to, during, and following the final evidentiary hearing, the Court construes three main grounds upon which Kapoor may have potentially breached the Settlement Agreement.  First is Kapoor's work with Imaginasian Hong Kong.  According to Circuitronix, the Imaginasian Website represents prohibited competition by Kapoor through its advertisement of many of the same metal parts that Circuitronix deals with.  Second is Kapoor's involvement with Imaginasian India and, by extension, Ei EMS—companies that, in Circuitronix's view, clearly engage in prohibited competition through their substantial work with PCBs and PCBAs.  Third is Imaginasian India's employment of two former Circuitronix employees while Kapoor was actively working for Imaginasian India.  *See generally* ECF No. [95] at 3-19.  With respect to each ground, Circuitronix expressed the following at the final evidentiary hearing: "[M]uch of the case we have against Mr. Kapoor is circumstantial. . . . [W]e're relying on descriptions that are contained in corporate filings. We're relying on images that Ei EMS may have produced, and things like that, to build a circumstantial case that he's violating the Settlement Agreement."  ECF No. [100] at 82-83.  With that in mind, the Court addresses each of the above mentioned grounds in turn.[5]

---

[5] Separate from these grounds, Kapoor relies first and foremost on the Settlement Agreement's general release, which he asserts "specifically released [him] for any claimed breach of the Settlement Agreement for any of the activities in which he is engaging."  ECF No. [104] at 3.  Kapoor argues that Circuitronix failed to produce any evidence that he has "engaged in any activity that was not fully disclosed in his sworn settlement affidavit."  *Id.* at 7.  Specifically, Kapoor points out that in the sworn affidavit he provided in conjunction with the parties' Mediated Settlement Term Sheet, he fully disclosed the incorporation of Imaginasian Hong Kong, his involvement in his father-in-law's metal parts business, and his work for his father with Imaginasian India.  *Id.* at 7 (citing ECF No. [47-1]).  But this begs the question.  Circuitronix does not allege a breach of the Settlement Agreement based solely on Kapoor's involvement with Imaginasian Hong Kong and Imaginasian India generally.  Instead, what Circuitronix claims is that Kapoor's work with these companies exceeds or is different than what Kapoor initially described in his sworn affidavit—e.g., Kapoor does sell prohibited metal parts, PCBs, and/or PCBAs.  The Mediated Settlement Term Sheet and Kapoor's sworn affidavit expressly contemplated that Kapoor was not engaged in such activities at that time, and so there is no question that the Settlement Agreement did not release them.  Importantly, even if such activities were disclosed, the scope of the Settlement

### 1. The Imaginasian Website

As mentioned, the genesis of Circuitronix's Cross-Motion is the Imaginasian Website, which states in an "About Us" section that: "When it comes to manufacturing high precision mechanical parts, we offer a one stop solution for all your needs." Pl. Exh. 21. Consistent with that description, various webpages throughout the Imaginasian Website display images and describe capabilities that relate to metal parts and processes that undoubtedly fall within Circuitronix's line of business. They include stamped sheet metal parts, CNC sheet metal parts, die casting, extrusions, heatsinks, tool and die manufacturing for plastic injection molded parts, PCBs, die casted parts, stamped parts, and cabinet locks. *Compare, e.g.*, Pl. Exhs. 18-21, *with* ECF No. [73] at 12-13. Kapoor has maintained all along, however, that the representations made on the Imaginasian Website with respect to these parts and processes do not actually reflect Imaginasian Hong Kong's business,[6] and are instead exaggerations that he made for the specific purpose of making Imaginasian Hong Kong appear as a bigger company than it actually is so that he might obtain "better pricing from suppliers."[7] Pl. Exh. 203 at 251; (ECF No. [101] at 108-09, 210-11). With respect to Imaginasian Hong Kong's suppliers, Circuitronix points out that Kapoor initially refused to disclose the identities of many of those suppliers, which, as it turns out, are "companies that advertise the same products as Circuitronix, including heatsinks, die

---

Agreement's general release is limited to "claims . . . on account of events that occurred *on or before* the date of this Settlement Agreement and General Release." ECF No. [53] at ¶ 9 (emphasis added). Here, Circuitronix alleges violative conduct occurring well after the Settlement Agreement—for example, Kapoor's work with Ei EMS. The Court therefore rejects Kapoor's general release argument and considers the merits of Circuitronix's claim.

[6] Although it appears that the Imaginasian Website is affiliated with both Imaginasian Hong Kong and Imaginasian India, *see* Pl. Exh. 126, Kapoor testified that the Imaginasian Website is that of Imaginasian Hong Kong's only, *see* ECF No. [101] at 11-12. In any event, Circuitronix's focus on Imaginasian India related specifically to its work with PCBs and PCBAs through Ei EMS, not necessarily to its sale of metal parts advertised on the Imaginasian Website.

[7] Kapoor testified that Imaginasian Hong Kong's only customer is BMTM, whom it sells metal parts to. *See* ECF No. [101] at 119.

casting, extrusions and PCB design." ECF No. [95] at 17 (citing Pl. Exhs. 232-235). In Circuitronix's view, Kapoor lacks credibility and all of the above mentioned evidence demonstrates that "it is more likely than not that Kapoor has not just advertised and marketed the same metal products as Circuitronix on the website of Imaginasian, but has actually traded in those products as well." *Id.* The Court is not convinced.

To begin with, Imaginasian Hong Kong does not sell a particular metal part or provide a certain service simply because its website says it does. As a prime example, the Imaginasian Website claims that "Imaginasian was established more than 4 decades ago in New Jersey, USA." Pl. Exh. 21. But it is undisputed that Imaginasian Hong Kong was formed in Hong Kong and Imaginasian India was formed in India, and that both companies were formed in 2015. The website contains additional puffery and falsehoods. To name just a few examples, one of the testimonials on the website is a company's CEO exclaiming that his company "ha[s] been working with [Imaginasian] for more than 15 years now, and hope[s] to continue for many years to come." Pl. Exh. 24. The claimed timeline is of course impossible. The website also states that Imaginasian is currently headquartered in New Jersey, but that is false; neither Imaginasian Hong Kong nor Imaginasian India has ever been headquartered in New Jersey. *See* ECF No. [101] at 111. Finally, the website touts a highly experienced management team consisting of a "combined experience of more than 100 years among [the] board of directors," *see* Pl. Exh. 21, but no one besides Kapoor has ever been involved with the management of Imaginasian Hong Kong, *see* ECF No. [101] at 112-13. Circuitronix asks the Court to find that Kapoor lacks credibility—and in turn view that lack of credibility as indicative of a guilty conscience—but the suggested notion cuts both ways. There is uncertainty surrounding Kapoor's overall credibility, and the same uncertainty surrounds the representations made on a website that he alone created

and maintains. But Kapoor's overall credibility aside, Circuitronix's claim ultimately asks the Court to accept as true certain representations made on the Imaginasian Website (specifically those that support its claim) while at the same time recognizing other representations made on the website as utterly false. The Court declines this invitation.

Furthermore, the Court does not view the Imaginasian Website any more persuasive even when considered in light of the fact that some of Imaginasian Hong Kong's suppliers advertise the same products as Circuitronix. In building its case, Circuitronix employed the efforts of several private investigators. As the progression of this case has revealed, however, those efforts were either not fruitful with respect to Imaginasian Hong Kong or were directed only toward Imaginasian India and Ei EMS. Specifically, Circuitronix offers no direct evidence that Imaginasian Hong Kong actually dealt in the prohibited parts or processes with any of its suppliers. Nor does Circuitronix offer evidence of a single solicitation made by Imaginasian Hong Kong to any company attempting to deal in the prohibited parts or processes. Likewise, Circuitronix offers no evidence of a solicitation made to Imaginasian Hong Kong to deal in the prohibited parts or processes and Imaginasian Hong Kong's response. Notably, Circuitronix has not offered an explanation for the lack of the above mentioned evidence nor given a reason as to why any efforts to obtain such evidence would have proven impracticable, particularly in light of the discovery opportunities that the Court provided the parties in order to support their respective positions. Though not necessarily dispositive in and of themselves, these omissions illustrate the great weight Circuitronix asks the Court to place on the Imaginasian Website. For the reasons explained, the Imaginasian Website is not enough to carry Circuitronix's burden.

## 2. Imaginasian India and Ei EMS

Next, as demonstrated at the final evidentiary hearing, the thrust of Circuitronix's Cross-Motion is Imaginasian India—in particular, the PCBA-related work of its subsidiary Ei EMS. As previously explained, the Court finds that Kapoor was sufficiently involved with the affairs of Ei EMS while he was employed with Imaginasian India and for some time after that employment such that Ei EMS's activities during the relevant time period can be attributed to him for purposes of the Settlement Agreement.

Though Kapoor does not dispute that the work of Ei EMS involves PCBAs, he argues that the evidence does not go a step further in establishing that Ei EMS *sells* PCBAs. Rather, Kapoor testified that Ei EMS manufactures for sale certain power supplies—a finished electronic product—and simply manufactures PCBAs for use in the power supplies it sells.[8] Circuitronix maintains, however, that the manufacture of PCBAs alone constitutes prohibited competition under the Settlement Agreement. *See* ECF No. [107] at 15 ("Kapoor . . . concedes that the evidence shows that he has engaged in the manufacture of PBCAs, through Ei EMS. Clearly, this is a material breach of the Settlement Agreement, as Circuitronix's lines of business are defined by the Court to specifically include the '**manufacturing** and distribution' of PCBA.") (internal citation omitted) (emphasis in original). But Circuitronix's interpretation is incorrect; the Court's phrasing of the line of business definition in the conjunctive rather than the disjunctive was deliberate. *See generally* ECF No. [73] at 12 ("the manufacturing *and* distribution of" PCBs and PCBAs) (emphasis added). The reason for this is that the line of business term does not

---

[8] To be sure, Circuitronix's line of business for purposes of the Settlement Agreement does not include the manufacture and sale of power supplies. *See* ECF No. [73] at 12-13. Indeed, the manufacture and sale of power supplies was a business activity of Kapoor—through Imaginasian India—that Kapoor disclosed in the sworn affidavit he provided in contemplation of the Settlement Agreement. *See* ECF No. [47-1] at ¶ 9(f) ("Imaginasian [India] is establishing sale of consumer Electronics in India, including Power Supply products . . . . These products . . . were finished consumer electronics (not PCBs).").

stand alone in the Settlement Agreement, but is instead implicated for enforcement purposes only in a specific context—that is, where there is competition. Circuitronix has made no argument—and the Court sees no basis for one—as to how the manufacturing of an input component within Circuitronix's line of business that is for the exclusive purpose of manufacturing and selling a final product that Circuitronix admittedly does not sell (or at least did not sell during Kapoor's employment with Circuitronix) can constitute competition with Circuitronix. As such, the Court finds that the mere manufacture of PCBAs by Kapoor is not enough to establish a breach of the Settlement Agreement.

Circuitronix does claim that Ei EMS also sells PCBs and/or PCBAs, *see* ECF No. [107] at 13 ("Kapoor's argument that there was no evidence at the 2-day hearing that Ei EMS sells PCBs or PCBAs is not correct.") (internal quotation marks omitted), but the circumstantial evidence Circuitronix relies on in making that claim is tenuous at best. That evidence includes language used in Ei EMS's corporate records reflecting that the company was formed to deal in "all kinds of electronic assemblies" and that the Ei EMS factory was leased to house the company's "Electronic Assemble Work"; investigative work revealing that the Ei EMS factory contains PCBA machinery and workers assembling PCBAs; statements made on Ei EMS's website relating to the company's PCB and PCBA capabilities; that Ei EMS does business with other PCB and PCBA companies; and even the name of Ei EMS itself.[9] *See id.* at 13-15 (citing Pl. Exhs. 60, 85, 223-231, 240). As is the case with the claim that Imaginasian Hong Kong deals in prohibited metals and processes, however, Circuitronix has not produced any evidence of a single transaction or solicitation involving the sale of a PCB or PCBA by Ei EMS. Though not necessarily fatal to Circuitronix's claim by itself, the Court finds the lack of such evidence

---

[9] The parties have indicated that "EMS," which refers to electronic manufacturing services, is synonymous with PCBA.

significant given that all of the above mentioned circumstantial evidence is consistent with Ei EMS dealing with and manufacturing for sale power supplies—which, as mentioned, does not encroach upon Circuitronix's line of business for purposes of the Settlement Agreement.

For example, Circuitronix points to Ei EMS's dealings with its two largest trading partners—EOS Power, Ei EMS's supplier, and Kent RO Systems Limited ("Kent RO"), Ei EMS and Imaginasian India's largest customer. More specifically, Circuitronix views as suspect financial statements of Imaginasian India reflecting that Imaginasian India dealt in "Electronic Parts" with EOS Power and Kent RO. *See* ECF No. [107] at 7 (citing Pl. Exh. 116 at 11; Pl. Exh. 121 at CTX426; Pl. Exh. 122 at CTX437-CTX439). But with respect to EOS Power, that company's own corporate disclosure records lists as its "[d]escription of product or service" the "[m]anufacturing and selling of Power Supplies" and identifies PCBs as a "Raw Material." Pl. Exh. 105 at CTX109, CTX239. In addressing those records, Kukreja testified that "if EOS [Power] has stocked printed circuit boards for resale at a later stage, they would call it as a raw material." ECF No. [100] at 169. That assertion is highly speculative and, problematically, not supported by any record evidence. Circuitronix's reliance on Kent RO is likewise speculative in nature. Circuitronix posits that Imaginasian India and/or Ei EMS must be selling PCBs and/or PCBAs to Kent because Kapoor was tasked with establishing business with Kent RO on behalf of Circuitronix while he was still employed with Circuitronix—in particular, the sale of PCBs, PCBA/EMS, and other materials—and, following Kapoor's termination and the formation of Imaginasian India, Imaginasian India did a substantial amount of business with Kent RO.[10] As Circuitronix argues, "[t]his context provides strong circumstantial evidence that Imaginasian and Kapoor are selling Kent the same products Kapoor discussed selling to Kent when he was working for Circuitronix . . . ." ECF No. [95] at 18. Notably, however, in characterizing Kent

---

[10] For whatever reason, Circuitronix never actually acquired Kent RO as a customer.

RO as a water filtration company that deals with PCBs and PCBAs generally, Circuitronix does not dispute that at least part of Imaginasian India and Ei EMS's business with Kent RO involves the sale of power supplies to Kent RO. *See id.* ("Based upon all of the evidence, it is clear that Imaginasian is selling Kent PCBs and PCBA/EMS products *including power supplies*.") (emphasis added). Ultimately, Circuitronix's assessment of the circumstantial evidence relating to Kent RO is simply too speculative to satisfy the more likely than not standard that the Court must apply.

Overall, the Court recognizes that it is certainly possible that Imaginasian India or Ei EMS has engaged or does engage in the sale of PCBs or PBCAs, the lack of direct evidence notwithstanding. But ultimately, the Court is not satisfied that the circumstantial evidence in this case is such that the likelihood of this is more likely than not. To find otherwise, in the Court's view, would require too much speculation and surmise.

### 3. Imaginasian India's Employment of Two Former Circuitronix Employees

Finally, in its bench brief filed prior to the final evidentiary hearing, Circuitronix pointed to corporate records of Imaginasian India reflecting that Imaginasian India had made payments to Abhishek Pachaury and Naveem Sharma—two former employees of Circuitronix—while Kapoor was working for Imaginasian India in what Kapoor characterized as a general manager role. ECF No. [95] at 19 (citing Pl. Exh. 122 at CTX437). At the final evidentiary hearing, Circuitronix argued that these records evinced employment relationships in violation of paragraph 4 of the Settlement Agreement, under which Kapoor shall not "solicit, recruit, or attempt to hire any employee, officer, director, shareholder or agent of Circuitronix or any of its vendors, customers or affiliates for a period of 5 years starting from the date September 15, 2015." ECF No. [53] at ¶ 4. The Court disagrees.

With respect to Pachaury, Circuitronix provided no evidence that Kapoor had anything to do with the hiring of Pachaury by Kapoor's father. To the contrary, Kukreja testified that Pachaury left Circuitronix prior to Kapoor's termination. Further, Kapoor testified that Pachaury went back to work for his father—whom Pachaury had previously worked for, for more than fifteen years—as soon as Pachaury left Circuitronix. The Court finds that testimony to be credible. As such, the Court finds that Pachaury was hired by Kapoor's father before Kapoor began working with Imaginasian India and, importantly, before the parties entered into the Settlement Agreement. Absent any supporting evidence, this undercuts the notion that Kapoor played a role in his father's hiring of Pachaury. It also makes clear that even if Kapoor did play such a role, Pachaury's hiring would not implicate the Settlement Agreement in the first place, having occurred before the Settlement Agreement was ever formed. *See* ECF No. [53] at ¶ 9 (releasing all claims, known or unknown, "on account of events that occurred on or *before* the date of this Settlement Agreement and General Release") (emphasis added).[11]

As to Sharma, who had also previously worked for Kapoor's father, the Court heard conflicting testimony from Kukreja and Kapoor as to whether Sharma was ever an employee of Circuitronix. But the Court need not resolve the factual dispute. Even assuming that the Sharma referenced in the Imaginasian India corporate record was a former co-employee of Kapoor's at Circuitronix,[12] there is no evidence whatsoever as to the circumstances surrounding Sharma's hire by Kapoor's father. Paragraph 4 of the Settlement Agreement prohibits Kapoor from "solicit[ing], recruit[ing], or attempt[ing] to hire" employees of Circuitronix. *Id.* at ¶ 4. That

---

[11] Although Kapoor was aware that Pachaury was working for his father, he testified that he was not aware for which of his father's companies Pachaury was working. To that extent, the Court notes that the payment to Pachaury reflected in the Imaginasian India corporate record relied upon by Circuitronix—which reflects one payment of approximately $10 U.S. dollars—is listed under "Other Current Liabilities" rather than "Employee Related . . . Salaries Payable." Pl. Exh. 122 at CTX437.
[12] Kukreja testified that "Naveen Kumar Sharma is a very common name in India." ECF No. [100] at 166-67.

Sharma worked for Imaginasian India at the same time that Kapoor worked for Imaginasian India in no way speaks to whether Kapoor had anything to do with how Sharma came to be employed by Imaginasian India, which is the relevant inquiry under paragraph 4 of the Settlement Agreement.

In sum, the Court concludes that the burden necessary to support Circuitronix's Cross-Motion has not been met.

## IV. CONCLUSION

Based on the foregoing, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion, **ECF No. [50],** is **DENIED**.

2. Plaintiff's Cross-Motion, **ECF Nos. [55], [56],** is **DENIED**.

**DONE and ORDERED** in Miami, Florida, this 10th day of August, 2017.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:
Counsel of Record