CIRCUITRONIX, LLC,

      Plaintiff,

v.

SUNNY KAPOOR,

      Defendant,

_____/

SUNNY KAPOOR,

      Counter-Plaintiff,

v.

RISHI KUKREJA,
CIRCUITRONIX, LLC,

      Counter-Defendants.

_____/

## ORDER ON MOTION FOR RELIEF FROM FINAL ORDER

**THIS CAUSE** is before the Court upon the Mandate of the United States Court of Appeals for the Eleventh Circuit vacating the Court's Order on Motion for Relief from Final Order, ECF No. [164] ("Relief Order"), and remanding the above-styled action for further proceedings. ECF No. [190] ("Mandate"). The Court has carefully reviewed the Mandate, the Relief Order, Circuitronix, LLC's ("Circuitronix") Motion for Relief from Final Order, ECF No. [145] ("Motion"), Defendant Sunny Kapoor's ("Kapoor") opposition to the Motion, ECF No. [147] ("Response"), Circuitronix's Reply, ECF No. [148] ("Reply"), the record in this case, the applicable law, and is otherwise fully advised. For the reasons that follow, the Motion is denied.

## I.     BACKGROUND

Because the procedural history and factual findings are relevant to determining the instant Motion, the Court finds that a review of the parties' dispute and pertinent portions of the record is appropriate.

### A.     The underlying action and settlement

This dispute stems from a falling out between Circuitronix, particularly its chief executive officer, Rishi Kukreja ("Kukreja"), and Kapoor, a former Circuitronix employee. Circuitronix is a company that, among other things, manufactures and distributes various metal parts for several industries that include automotive, industrial, lighting, and security systems. The bulk of its business involves printed circuit boards ("PCBs") and printed circuit board assembly ("PCBA"). PCBs are used as an essential component in almost all finished electronic products, and PCBA is the process of assembling electronic components to PCBs. *See* ECF No. [100] at 67-71. Kapoor served as Circuitronix's assistant chief executive officer from October 2012 until his employment was terminated in March 2015. In that capacity, Kapoor operated out of Circuitronix's office in Hong Kong, and his employment as Circuitronix's assistant CEO was subject to a series of employment agreements. *See* ECF Nos. [1-1]-[1-2]. Following his termination, Circuitronix initiated the underlying suit against Kapoor, asserting claims for the dissemination of Circuitronix's proprietary information, self-dealing and other breaches of Kapoor's employment agreements and fiduciary duties. In response, Kapoor filed a counterclaim against Circuitronix and Kukreja, asserting claims for breach of employment contract, unlawful retaliation, civil theft, and unpaid wages.

On December 1, 2015, the parties signed a "Mediated Settlement Term Sheet" after resolving all disputed claims asserted against one another at a scheduled mediation. *See* ECF No. [67]. The Mediated Settlement Term Sheet provided a "general release of all claims by the parties

against one another, known or unknown, existing or inchoate, based on any conduct or occurrence prior to and including the date that the Settlement Agreement and General Release is executed[.]" *Id.* at ¶ 7. The Mediated Settlement Term Sheet also provided that the general release applied to "any agent, affiliate or shareholder of the parties." *Id.* In consideration for the general release, Kapoor was required to provide Circuitronix with a sworn affidavit disclosing all activities in which he was engaged prior to December 1, 2015, that could potentially constitute violations of any provisions of his employment agreements. *Id.* at ¶ 3.

On December 15, 2015, Kapoor provided his sworn affidavit, *see* ECF No. [47-1], and the parties entered into a final Settlement Agreement and General Release ("Settlement Agreement") that set forth the terms of the parties' agreement to resolve their respective claims, *see* ECF No. [53]. As agreed upon, Kapoor recounted in his sworn affidavit recent actions that he believed could potentially relate to certain provisions of his employment agreements. Most notably, regarding an "exclusive employment provision," in January 2015 Kapoor assisted his wife, Payal Bawa, in forming a company in Hong Kong, Imaginasian Ltd. ("Imaginasian Hong Kong"), the initial purpose of which was for Payal to establish "freelancing business in addition to exploring other opportunities." ECF No. [47-1] at ¶ 9(b). Following his termination from Circuitronix, Kapoor actively worked for Imaginasian Hong Kong after deciding to use the company for "sourcing metal parts" for his father-in-law's, Chand Bawa, metal and mechanical parts business, Bawa Machine and Tool Manufacturing ("BMTM"). *Id.*

Kapoor assured that none of the potential suppliers for his father-in-law's business that he had met with up to that point were suppliers, customers or competitors of Circuitronix. He also represented that none of his meetings related to any product manufactured or sold by Circuitronix. *See id.* at ¶¶ 9(c)-(d). Kapoor further stated that the meetings he attended were with "potential suppliers for finished consumer electronics (not PCBs) to study pricing and seek potential market

in USA and India." *Id.* at ¶ 9(d). Similarly, Kapoor assured that the metal parts he was helping his father-in-law source were not parts manufactured or sold by Circuitronix or parts that were in any way related to parts manufactured or sold by Circuitronix. *Id.* at ¶ 9(e).

Kapoor also disclosed in his sworn affidavit a second company he was actively working for at the time, Imaginasian Equipments Pvt. Ltd. ("Imaginasian India"), which his father formed in India in August 2015 to "facilitate sourcing of equipment used in the hospitality Industry[.]" *Id.* at ¶ 9(f). Kapoor assured that none of the products Imaginasian India did business with were related to any products manufactured or sold by Circuitronix. *Id.* He further specified that Imaginasian India was "establishing sale of consumer Electronics in India, including Power Supply products, IOT devices and other consumer electronics[,]" and was "undertaking design projects for high end IOT consumer electronics." *Id.* Moreover, Kapoor acknowledged in his sworn affidavit that a "Restrictive Covenant" prohibiting him from competing with Circuitronix was binding for a period of three years starting on September 15, 2015, and "applie[d] to all lines of business in which Circuitronix engages[.]" *Id.* at ¶ 11. Kapoor further assured that he had not taken any actions that would constitute competition with Circuitronix and that he had not solicited Circuitronix's customers or employees. *Id.* at ¶¶ 11-12.

The final Settlement Agreement incorporated by reference the Mediated Settlement Term Sheet and was formally approved by the Court on December 17, 2015. ECF No. [44]. Importantly, the Settlement Agreement contains restrictive covenants that prohibit Kapoor from competing with Circuitronix. In particular, paragraph 3 of the Settlement Agreement provides in relevant part: "Defendant shall not (individually, or as an officer, director, partner, shareholder, agent or affiliate) compete with Circuitronix, anywhere in the world, for a period of 3 years starting from September 15, 2015. Defendant acknowledges that this restriction applies to all *lines of business* in which Circuitronix engaged during the time period Defendant was employed by Circuitronix[.]" ECF

No. [53] at ¶ 3 (emphasis added). Paragraph 4 of the Settlement Agreement states that Kapoor shall not "solicit, recruit, or attempt to hire any employee, officer, director, shareholder or agent of Circuitronix or any of its vendors, customers or affiliates[,]" and paragraph 5 of the Settlement Agreement provides that Kapoor "shall not to [sic] have any contact, that he initiates and/or was planned, with any suppliers, customers or employees of Circuitronix[.]" *Id.* at ¶¶ 4-5.

Consistent with the general release in the Mediated Settlement Term Sheet, paragraph 9 of the Settlement Agreement provides a general release, which states in relevant part: "Plaintiffs . . . do hereby release and forever discharge and hold harmless Defendant . . . from any and all . . . claims . . ., known or unknown, which they ever had, now had, or shall or may have in the future . . . on account of events that occurred on or before the date of this Settlement Agreement and General Release." *Id.* at ¶ 9.

### B. Circuitronix's first motion to enforce and the parties' subsequent cross-motions

Shortly after the Court approved the Settlement Agreement, Circuitronix filed its first motion for enforcement of the Settlement Agreement on December 30, 2015, claiming that Kapoor was competing directly with Circuitronix through work he was performing at the time for BMTM, his father-in-law's metal parts company. *See* ECF No. [45]. The parties resolved that motion by filing a Joint Stipulation on January 22, 2016, which stipulation specifically provided that "[p]ursuant to the Parties' Settlement Agreement, Kapoor shall not, directly or indirectly, engage in any line of Circuitronix's business, including within the scope of his work with [BMTM]." ECF No. [48]. The Joint Stipulation also identified certain metal parts that Kapoor's work with BMTM did not involve. *See id.* at 2 n.1.

In April 2016, Kukreja discovered a website operated by Imaginasian Hong Kong (the "Imaginasian Website") which, based on its content, led Kukreja to believe that either Imaginasian

Hong Kong or Imaginasian India (or both) (collectively, "Imaginasian") were directly competing with Circuitronix. Kukreja was particularly concerned by the Imaginasian Website's marketing and advertising of two product lines, "Electronics" and "Mechanics." In Circuitronix's view, the Imaginasian Website demonstrated that Kapoor was conducting business in direct competition with Circuitronix through BMTM and Koala Holdings, LLC ("Koala Holdings")[1] by selling or supplying a number of products in Circuitronix's line of business. Accordingly, on August 1, 2016, Circuitronix sent letters to BMTM and Koala Holdings that notified both companies of the existence of the Settlement Agreement between Circuitronix and Kapoor and of Kapoor's obligation not to compete with Circuitronix. *See* ECF Nos. [50-1]-[50-2].

Based on these letters, Kapoor filed his motion to enforce the confidential settlement agreement on September 9, 2016, arguing that the letters violated the Settlement Agreement's confidentiality and non-disparagement clauses[2] and requesting that Kapoor be granted limited discovery to determine if Circuitronix had sent any additional violative letters to third parties. *See* ECF No. [50]. Circuitronix, in response, filed its cross-motion to enforce settlement agreement on September 26, 2016, relying in part on the Imaginasian Website to allege that Kapoor was materially breaching the Settlement Agreement—namely, by directly competing with Circuitronix's line of business through a series of related companies operated by himself and

---

[1] Koala Holdings is owned by Kapoor's brother-in-law, Rohit Bawa.

[2] Paragraph 13 of the Settlement Agreement prohibits the parties from taking any "action which is intended, or would reasonably be expected, to harm each other's reputations or which would reasonably be expected to lead to unwanted or unfavorable publicity." ECF No. [53] at ¶ 13. Paragraph 14 of the Settlement Agreement prohibits the parties from "issu[ing] any press release or mak[ing] any public statements with respect to the subject matter of this Settlement Agreement and General Release unless required by law." *Id.* at ¶ 14. Paragraph 21 of the Settlement Agreement deems "[a]ll information contained in and provided pursuant to" the Settlement Agreement as confidential information and mandates that the parties "take reasonable steps to ensure that such confidential information is not disclosed or disseminated to third parties or the public." *Id.* at ¶ 21.

members of his family, including Imaginasian, BMTM, and Koala Holdings.  *See* ECF No. [55].

Circuitronix also requested limited discovery in order to seek additional evidence of Kapoor's

alleged breach of the Settlement Agreement.  *See id.*

### C. The initial evidentiary hearing on December 8, 2016 and the Court's December 16, 2016 order

The Court held an initial evidentiary hearing on the cross-motions on December 8, 2016.

*See* ECF No. [72].  Much of the hearing was dedicated to ascertaining how the parties intended

Circuitronix's "line of business" to be interpreted under the Settlement Agreement, as the parties

had been unable to reach a consensus on the undefined term, critical as it was to Circuitronix's

cross-motion.  *See* ECF No. [73] at 8.  The parties submitted extensive documentation to support

their respective positions on the issue.

The remainder of the hearing focused on the Imaginasian Website, *see* Pl. Exhs. 15-27,

which Kapoor admitted to creating and maintaining.  In particular, Circuitronix directed the

Court's attention to the Imaginasian Website's "Electronics" and "Mechanics" pages.  The

Electronics page prominently displayed PCBs and PCBAs and described Imaginasian as having

"long been serving automotive, industrial, security, medical and consumer electronics industry

[sic]."  Pl. Exh. 16.  According to Circuitronix, this advertisement mirrored what was advertised

as Circuitronix's PCB-related specialty on its website.  *See* ECF No. [95] at 4.  The Imaginasian

Website's Mechanics page advertised certain metal parts and manufacturing processes that

Circuitronix claimed overlapped with its metals business and that Kapoor had previously denied

working with in the parties' January 22, 2016 Joint Stipulation.  *See* Pl. Exh. 16; ECF No. [48] at

2 n.1.  Circuitronix argued that the Imaginasian Website demonstrated that Kapoor had been

competing in Circuitronix's line of business.

Following the initial evidentiary hearing, on December 16, 2016, the Court entered an Order defining Circuitronix's line of business for purposes of the Settlement Agreement as "the manufacturing and distribution of: (1) printed circuit boards, including rigid, rigid-flex, flex and/or metal clad; (2) plastic injection molded parts, including single shot, multi shot, gas assist molding, foam molding, vertical molding, overmolding, and insert molding; (3) compression and injection rubber parts, including silicone rubber keypads, gaskets, grommets, and elastomer strips; (4) metal parts, including stamped sheet metal parts, CNC sheet metal parts, die casting, extrusions, heatsinks, tool and die manufacturing for plastic injection molded parts, printed circuit boards, die casted parts, stamped parts, and cabinet locks; (5) printed circuit board assembly, including through hole, SMT, BGA, and COB; and (6) polymer thick film technology for different laminate substrates, including CEM-1, FR4, CEM-3, FR2 and ceramic." ECF No. [73] at 12-13.

The December 16, 2016 Order allowed Circuitronix limited discovery to determine whether Kapoor materially breached the Settlement Agreement by competing in the defined line of business or "by otherwise violating the restrictive covenants found under paragraphs 4 or 5 of the Settlement Agreement." *Id.* at 15. Additionally, the December 16, 2016 Order scheduled a final evidentiary hearing to fully resolve the cross-motions. *Id.* at 16.

### D. The final evidentiary hearing on April 24, 2017 and April 26, 2017

At the final evidentiary hearing on April 24, 2017 and April 26, 2017, much of the focus of Circuitronix's cross-motion was on Imaginasian India and Ei EMS India Private Limited ("Ei EMS"), and in particular, Kapoor's affiliation with those companies and their work related to PCBs and PCBAs. The evidence presented reflected that Ei EMS was formed on September 29, 2016 as a joint venture and subsidiary of Imaginasian India and EOS Power India Private Limited ("EOS Power")—a supplier of Imaginasian India whose corporate filings reflected that its work involved PCBs as well as PCBAs. Kapoor's mother, Asha Kapoor, served as an appointed director of Ei

EMS and also served as Ei EMS's Imaginasian India representative. Like EOS Power, Ei EMS's corporate filings reflected that it too is a PCB and PCBA company. For example, Ei EMS's Memorandum of Association indicated that the company's object is to "deal in all kinds of electronic assemblies, equipment, components, devices and appliances[.]" Pl. Exh. 60 at ECF No. [112-4], CTX1008.

At the hearing, Kapoor offered testimony denying any official role with Ei EMS, and no direct evidence was presented that he had any ownership stake in, or was ever officially employed by, Ei EMS. *See, e.g.*, Pl. Exh. 86. Kapoor also denied having any part in Ei EMS's dealings with third-party companies. Nevertheless, the Court was presented with evidence of considerable involvement between Kapoor and Ei EMS such that, for purposes of the Settlement Agreement, the Court attributed Ei EMS' activities to Kapoor while Kapoor worked for, and continued to remain active with, Imaginasian India, one of Ei EMS's parent companies. Kapoor testified that he stopped working with Imaginasian India sometime prior to September 2016, in order to focus on his work with Imaginasian Hong Kong. But before doing so, Kapoor testified that he and his father discussed the formation of Ei EMS as a subsidiary of Imaginasian India to develop a PCBA factory. After the development of the Ei EMS factory, and even after Kapoor stopped working for Imaginasian India in an official capacity, Kapoor visited the Ei EMS factory on eight to ten occasions in 2017. During those visits, Kapoor engaged in business-related discussions with managing members of Ei EMS and EOS Power. On one occasion, a private investigator hired by Circuitronix spoke with an individual at the Ei EMS factory who identified himself as an engineer for Ei EMS and, when asked, identified Kapoor as the "boss" of Ei EMS.[3] *See* Pl. Exh. 231.

---

[3] Circuitronix also presented bank statements of Imaginasian India reflecting that Imaginasian India had made payments to Kapoor (totaling in the thousands of U.S. dollars) throughout the fourth quarter of 2016 (after the formation of Ei EMS) and into early 2017.

As to the work performed by Ei EMS, Circuitronix's investigative efforts also revealed the presence of PCBA machinery and workers assembling PCBAs within the Ei EMS factory. *See* Pl. Exhs. 223-231. Similarly, Ei EMS's website touted the company's efforts in the PCBA industry, including its "bare assemblies and sub-assemblies" capabilities. Pl. Exh. 240. Circuitronix argued that Ei EMS's work related to PCBAs constituted competition with Circuitronix's line of business and thus established that Kapoor had violated the Settlement Agreement. Therefore, following the hearing, the only remaining issue before the Court was whether Kapoor had materially breached the Settlement Agreement as alleged in Circuitronix's cross-motion.

### E. The August 10, 2019 final order on the cross-motions

On August 10, 2017, the Court entered its Final Order on Cross-Motions to Enforce Settlement Agreement. ECF No. [110] ("Final Order"). The Court observed that three main grounds existed to evaluate whether Kapoor breached the settlement agreement: (1) Kapoor's work with Imaginasian Hong Kong; (2) Kapoor's involvement with Imaginasian India and, by extension, Ei EMS; and (3) Imaginasian India's employment of two former Circuitronix employees while Kapoor was actively working for Imaginasian India. *Id.* at 13. Ultimately, the Court found the evidence insufficient to establish a material breach of the Settlement Agreement under any of these bases by a preponderance of the evidence. *See id.* at 14-22.

Regarding the first ground, the Imaginasian Website, the Court found that the website contained images and depicted capabilities that "undoubtedly fall within Circuitronix's line of business," *id.* at 14, but that the evidence reflected "puffery and falsehoods," which without more, failed to show that it was more likely than not that Kapoor, through Imaginasian Hong Kong, was competing with Circuitronix. *See id.* at 15-16. Specifically, the Court explained that it could not conclude that Imaginasian Hong Kong sold a particular metal part or provided a certain service merely because the Imaginasian Website contained representations to that effect. *Id.* at 15. The

Imaginasian Website was replete with falsehoods, *id.*, and the Court declined Circuitronix's invitation to accept as true certain representations made on the website while concomitantly recognizing that numerous other representations made on the website as false. *Id.* at 16. The Court also found that Circuitronix did not offer direct evidence that Imaginasian Hong Kong actually dealt in the prohibited parts or processes. *Id.* Further, the Court found that Circuitronix did not offer evidence of a single solicitation made by Imaginasian Hong Kong to any company attempting to deal in the prohibited parts or processes nor did it offer evidence of a solicitation made to Imaginasian Hong Kong to deal in the prohibited parts or processes and Imaginasian Hong Kong's response. *See id.*

Regarding the second ground, Kapoor's involvement with Imaginasian India and Ei EMS, the Court found that Circuitronix had not produced any evidence showing that Ei EMS produced PCBs or PCBAs for any purpose other than for their inclusion in power supplies—of which the manufacture and sale of power supplies as a stand-alone product does not come within the ambit of Circuitronix's line of business for purposes of the Settlement Agreement.[4] *See id.* at 17-20. In particular, the Court explained that it saw no basis "as to how the manufacturing of an input component within Circuitronix's line of business that is for the exclusive purpose of manufacturing and selling a final product that Circuitronix admittedly does not sell (or at least did not sell during Kapoor's employment with Circuitronix) can constitute competition with Circuitronix." *Id.* at 18. Accordingly, the Court found that "the mere manufacture of PCBAs by Kapoor is not enough to establish a breach of the Settlement Agreement." *Id.* The Court likewise found that Circuitronix

---

[4] The Court noted that the definition of line of business as set forth in the December 16, 2016 Order, ECF No. [73], "the manufacture *and* distribution of" PCBs and PCBAs, was deliberate and in the conjunctive rather than disjunctive. *See* ECF No. [110] at 17 (emphasis added).

did not produce any evidence of a single transaction or solicitation involving the sale of a PCB or PCBA by Ei EMS.[5]  *See id.* at 18-19.

Finally, regarding the third ground, Imaginasian India's employment of two former Circuitronix employees, Abhishek Pachaury and Naveem Sharma, the Court found the evidence insufficient to establish that Kapoor breached paragraph 4 of the Settlement Agreement.  *Id.* at 20-22.  As to Pachaury, Circuitronix failed to produce evidence that Kapoor had anything to do with Pachaury's hiring by Kapoor's father.  The Court found that Pachaury was hired by Kapoor's father before Kapoor began working with Imaginasian India and before the parties entered into the Settlement Agreement.  *Id.* at 21.  As to Sharma, the Court found "no evidence whatsoever as to the circumstances surrounding Sharma's hire by Kapoor's father."  *Id.*  "That Sharma worked for Imaginasian India at the same time that Kapoor worked for Imaginasian India in no way speaks to whether Kapoor had anything to do with how Sharma came to be employed by Imaginasian India, which is the relevant inquiry under paragraph 4 of the Settlement Agreement."  *Id.* at 21-22.

### F.  Circuitronix's motion for relief from the Final Order because of Kapoor's alleged false testimony and misrepresentations

On September 7, 2017, Circuitronix filed its notice of appeal of the Court's December 16, 2016 Order, ECF No. [73], and the Court's August 10, 2017 Final Order, ECF No. [110].  *See* ECF No. [125].  Before the Eleventh Circuit ruled on Circuitronix's appeal of the Orders, Circuitronix filed the instant Motion, ECF No. [146], seeking relief from the Final Order.

---

[5] Although the Court concluded that Circuitronix failed to produce sufficient evidence to carry its burden, the Court recognized that "it is certainly possible that Imaginasian India or Ei EMS has engaged or does engage in the sale of PCBs or PBCAs [sic], the lack of direct evidence notwithstanding."  *Id.* at 20.  However, in light of the limited evidence presented, the Court explained that it was "not satisfied that the circumstantial evidence in this case is such that the likelihood of this is more likely than not."  *Id.*

In the Motion, Circuitronix argued that Kapoor "knowingly provided false testimony under oath" in a "conscious effort to mislead the Court[,]" lied during discovery, concealed evidence, prevented Circuitronix from fully and fairly presenting its case, and made misrepresentations that "went directly to the heart of the disputed issues in the case[.]" *Id.* at 1. Specifically, Circuitronix asserted that Kapoor gave false testimony about (1) his work with Imaginasian India and Ei EMS; (2) Ei EMS' business as it relates to PCBAs and power supplies; and (3) Ei EMS' dealings with its customers or other third-party companies, such as Kent RO Systems Limited ("Kent"). *See id.* at 1-2. According to Circuitronix, in contrast to Kapoor's testimony, he was actually the general manager of both Imaginasian India and Ei EMS at the time of the final hearing and was serving as Ei EMS' CEO such that Kapoor "had full access to all of the business records of Imaginasian and Ei EMS[.]" *Id.* at 2. Further, in contrast to Kapoor's testimony, Ei EMS is a "contract manufacturer" that only sells PCBA or electronic manufacturing services ("EMS") and has "generated millions of dollars in revenue from the sale of PCBA / EMS services to its customers." *Id.* Circuitronix added that Ei EMS does not sell power supplies as a finished product. *See id.* Moreover, in contrast to Kapoor's testimony, he had direct contact and communication with Ei EMS customers, including Kent, for the purpose of selling PCBA. *Id.*

In support of the Motion, Circuitronix relied primarily on a Declaration provided by Ralph Bischoff ("Bischoff"), an Ei EMS board member and EOS Power board member. ECF No. [145-1] ("Bischoff Declaration").[6] Circuitronix represented that Bischoff's Declaration "describes the true activities of Ei EMS, Kapoor's direct participation in those activities, and Kapoor's central role in both Imaginasian and Ei EMS." *Id.* at ECF No. [145] at 3. For instance, Circuitronix stated that Ei EMS' business "includes the assembly of printed circuit boards and other electronic

---

[6] Bischoff indirectly owns 45% of the shares of Ei EMS. ECF No. [145] at 3.

components for its customers," Ei EMS does not own the design of the end products it assembles, Ei EMS' customers[7] pay Ei EMS to assemble or manufacture their products, and Ei EMS "only builds power supplies as a contract manufacturer, providing PCBA / EMS services." *Id.* at 8-9. Circuitronix also produced an Ei EMS loan agreement, ECF No. [145-2], and an Ei EMS board report, ECF No. [145-3], that each listed Kapoor as Ei EMS' CEO. *Id.* at 3. In Circuitronix's view, this evidence demonstrated that Kapoor "is operating a substantial business in India that directly competes with Circuitronix in the PCBA / EMS line of business, in direct violation of the Settlement Agreement," and that Kapoor's alleged perjury and misconduct prevented Circuitronix from fully and fairly presenting its case. *Id.*

Circuitronix also represented that Kapoor is "highly involved in the efforts to solicit and acquire customers for the PCBA / EMS business of Ei EMS." *Id.* at 9. For example, since 2016, Kapoor allegedly "frequently communicated" with Kent on behalf of Ei EMS. *Id.* These communications included invoices, purchase orders, emails and other written forms of communications. *Id.* at 18. Further, Circuitronix stated that since 2016, Kapoor has had "complete and personal knowledge" of Ei EMS' products, services, sales, customers, and finances and has "direct knowledge and responsibility" for purchasing PCBs and providing PCBA services to package parts and sell them to customers. *Id.* at 10. Circuitronix concluded that "[t]here can be no doubt that Kapoor's false testimony and discovery misconduct prevented Circuitronix from fully and fairly presenting its case. If Kapoor had testified truthfully in his deposition and produced the business records of Imaginasian and Ei EMS, including all of his communications with Kent, . . . those documents would have been available to Circuitronix at trial and would have proven its

---

[7] The Motion notes that Ei EMS' customers include Kent, Anchor Electricals Private Limited, a wholly-owned subsidiary of the Panasonic Corporation, and Su-Kam Power Systems Limited. ECF No. [145] at 9.

counterclaim against Kapoor beyond all doubt." *Id.* at 18. Accordingly, based on the "new evidence," the Motion requested relief from the Final Order pursuant to Rule 60(b)(3), Fed. R. Civ. P.

In his Response, Kapoor characterized the "new evidence" raised in the Motion as "supplemental evidence" that relitigates two points: (1) Kapoor lacks credibility and lied about his involvement with Imaginasian India and Ei EMS, and (2) the mere selling of end products (for instance, power supplies) that contain input components (for instance, PCBAs) is sufficient to establish competition by Ei EMS within the defined line of business under the Settlement Agreement. *See* ECF No. [147] at 1-2. He posited that because the Court already considered and rejected these arguments in the Final Order, ECF No. [110], the evidence cannot serve as a basis for relief pursuant to Rule 60(b), Fed. R. Civ. P. *Id.* at 2. The Response, moreover, challenged that the Motion fails as a matter of law because it does not satisfy the clear and convincing evidence standard under Rule 60(b)(3). In particular, Kapoor maintained that he gave truthful testimony, the purported "new evidence" is insufficient to establish that he provided false testimony, the Bischoff Declaration does not state that Kapoor is manufacturing and selling any product within Circuitronix's line of business, the Final Order was not based on any fraud committed by Kapoor, Circuitronix was given ample opportunity to present its case but its failure to do so was not based on alleged fraud committed by Kapoor, and the Motion is untimely. *See generally* ECF No. [147].

In its Reply, Circuitronix contended that Kapoor's testimony in support of the Response was false and, in Circuitronix's view, the testimony constituted another attempt to perpetrate a fraud on the Court. ECF No. [148]. The Reply included a Declaration from Kukreja and a supplemental Declaration from Bischoff, the latter of which contained 34 exhibits and totaled over 450 pages. Circuitronix stressed that these materials contained "additional testimony and documents, including emails and text messages from Kapoor himself, showing beyond any doubt

that Bischoff's testimony is truthful and Kapoor's is false and fraudulent." *Id.* at 1. According to Circuitronix, these attachments "clearly show[ed]" that "(1) Kapoor was the general manager of both Imaginasian and Ei EMS and was the CEO [of] Ei EMS throughout this case; (2) Kapoor had full access to the documents and records of these companies throughout the case, but fraudulently concealed those records in discovery; (3) Kapoor engaged in prohibited competition with Circuitronix involving the sale of PCBA / EMS; (4) Kapoor specifically targeted and solicited the customers of Circuitronix; and (5) Kapoor consciously lied to the Court regarding all of these important matters during discovery, at trial, and again in his most recent Declaration." *Id.* at 2. Additionally, Circuitronix asserted that the Motion was timely filed. *Id.* at 11-12.

### G. The Eleventh Circuit's affirmance of the Final Order

After the parties had fully briefed the Motion, *see* ECF Nos. [145], [147], and [148], the Eleventh Circuit issued its first mandate on August 31, 2018, affirming the Court's determination in the Final Order that Kapoor did not violate the terms of the non-compete agreement contained in the Settlement Agreement and concluding that the Court "did not clearly err in making the factual findings that underlie its judgment[.]" ECF No. [150], *Circuitronix, LLC v. Kapoor*, 748 F. App'x 242 (11th Cir. 2018). In particular, the Eleventh Circuit panel agreed that "Circuitronix was unable to produce any evidence that Kapoor even attempted to sell any product in competition with Circuitronix's defined line of business" and that in light of the evidence presented, "the court did not clearly err in finding that Circuitronix failed to show it more likely than not that Kapoor was competing with any of Circuitronix's defined lines of business." *Id.* at 246. Further, that court rejected Circuitronix's argument that the Court clearly erred in finding that Kapoor's involvement with Ei EMS did not breach the Settlement Agreement. *Id.* "While Circuitronix demonstrated that Ei EMS *manufactured* PCBs and PCBAs at its facility, it provided no evidence—which was required to prove a breach—that Ei EMS also *sold* PCBs or PCBAs as stand-alone products rather

than as a component part of the power supplies it sold. The court was free to credit Kapoor's explanation that the products were manufactured only for use in power supplies, a product that is not included in Circuitronix's line of business. We cannot say the court clearly erred." *Id.* (emphasis in original).

**H.    The Relief Order denying Circuitronix's motion for relief from the Final Order**

On December 3, 2018, the Court entered its Order on Motion for Relief from Final Order ("Relief Order"), ECF No. [164], and denied the Motion, ECF No. [147]. The Court agreed with Kapoor that the Motion provided "supplemental evidence" to support its claim, which had already been ruled upon by the Court, and that Circuitronix did not provide clear and convincing evidence of fraud, misrepresentation, or misconduct to justify relief from the Final Order. *Id.* at 2-3. Importantly, the Court found, first, that despite the lack of direct evidence that Kapoor held an ownership stake in or was officially employed by Ei EMS, the Court still had attributed Ei EMS' activities to Kapoor for purposes of the Final Order but nonetheless determined that Ei EMS' activities did not encroach upon Circuitronix's line of business. *Id.* at 3. The materials presented in the Motion and in the Reply, while further calling into question Kapoor's credibility, did not produce evidence to disturb the Court's Final Order. Second, the Court found that Circuitronix did not provide any evidence of a transaction or solicitation involving the sale of PCB or PCBA by Ei EMS. Finally, the Court explained that Circuitronix could have called Bischoff to testify at the final hearing given that there was no indication that Circuitronix was unaware of him prior to that time. *Id.*

In light of this ruling, Circuitronix filed its notice of appeal of the Relief Order on January 3, 2019. ECF No. [165].

### I.     The Eleventh Circuit's mandate vacating the Relief Order

On August 21, 2019, another panel on the Eleventh Circuit issued the instant Mandate, ECF No. [190], *Circuitronix, LLC v. Kapoor*, 785 F. App'x 678 (11th Cir. 2019), vacating the Relief Order, ECF No. [168], and remanding for an express determination of the scope of paragraphs 4 and 5 of the Settlement Agreement and reconsideration of the Relief Order.

The Eleventh Circuit noted that its prior mandate did not address paragraphs 4 and 5 of the non-compete agreement contained in the Settlement Agreement.  It also added that the Court did not focus on these provisions in the Final Order or in the Relief Order, and thus because "the few conclusions that the district court did reach regarding to [sic] those provisions of the Settlement Agreement may have been erroneous," the Relief Order is vacated and the case remanded for reconsideration. *Id.* at 680.  The Mandate explained that the Court's prior conclusion in the Relief Order that Circuitronix did not provide any evidence of a transaction or solicitation involving the sale of PCB or PCBA by Ei EMS was predicated upon the Court's "construction of the Settlement Agreement as preventing Kapoor from entering into transactions with and soliciting or contacting Circuitronix's customers concerning defined 'lines of business.'" *Id.* The phrase, "lines of business," however, "appears only alongside the prohibition on Kapoor entering into transactions with Circuitronix's customers.  It is absent from the provisions that restrain Kapoor from soliciting or contacting Circuitronix's customers." *Id.*  The Mandate concluded that "this difference may matter—in that the 'lines of business' limitation may apply only to the former provision, not to the latter." *Id.*

Specifically, the Eleventh Circuit noted that the negative-implication canon, *expressio unius est exclusio alterius* ("*expressio unius*"), may apply and "could sway the result." *Id.* at 681. Thus, the Eleventh Circuit declared that it "need[ed] to know whether, as a matter of pure contract

interpretation, Kapoor was allowed to solicit or contact Circuitronix's vendors, customers, or affiliates (Paragraph 4), or to contact its suppliers, customers, or employees (Paragraph 5) so long as it did not involve the production of PCBs and PCBAs as stand-alone, final products." *Id.* The panel explained that the "reason that the answer to the interpretive question matters here is that the evidence that Circuitronix presented in support of its Rule 60(b)(3) motion suggests that Kapoor *did* solicit and contact Circuitronix's customers concerning PCBs and PCBAs— repeatedly. If Kapoor was allowed to do so under the Settlement Agreement . . . then the district court's Order should stand. If Kapoor was barred from doing so under the Settlement Agreement . . . then Kapoor appears to have violated the Settlement Agreement." *Id.* at 681-82 (emphasis in original). The Mandate vacated the Relief Order and remanded "for an express determination regarding the scope of the restrictions imposed by Paragraphs 4 and 5 of the Settlement Agreement" and, with that determination, the Court "may of course proceed to decide whether Rule 60(b)(3) relief is appropriate." *Id.* at 682.

## II.    DISCUSSION

In accordance with the Mandate and upon reconsideration, deciding whether Circuitronix is entitled to relief under the Motion raises three overarching issues. First, as a matter of contract interpretation, whether the "lines of business" restriction contained in paragraph 3 of the Settlement Agreement applies to the non-solicitation and non-contact provisions in paragraphs 4 and 5 of the Settlement Agreement. Second, whether the evidence presented to the Court demonstrated that Kapoor breached paragraphs 4 and 5 of the Settlement Agreement. And third, whether relief under Rule 60(b)(3) is appropriate. The Court will address these issues in turn.

### A.    Paragraphs 4 and 5 invoke the lines of business restriction

"[A] settlement agreement is essentially a contract and is subject to the traditional rules of contract interpretation." *Norfolk S. Corp. v. Chevron, U.S.A., Inc.,* 371 F.3d 1285, 1290 (11th

Cir. 2004) (citing *Monahan v. Comm'r,* 321 F.3d 1063, 1068 (11th Cir. 2003) ("Principles governing general contract law apply to interpret settlement agreements.")).

All parties agree that Florida law applies to construe the Settlement Agreement. The "polestar guiding the court in the construction of a written contract is the intent of the parties." *Crastvell Trading Ltd. v. Marengere*, 90 So. 3d 349, 353 (Fla. 3d DCA 2012). "The intent of the parties to the contract should govern the construction of a contract. To determine the intent of the parties, a court should consider the language in the contract, the subject matter of the contract, and the object and purpose of the contract." *Am. Home Assurance Co. v. Larkin Gen. Hosp., Ltd.*, 593 So. 2d 195, 197 (Fla. 1992). Further, courts are to "read provisions of a contract harmoniously in order to give effect to all portions thereof." *City of Homestead v. Johnson*, 760 So. 2d 80, 84 (Fla. 2000). *See also Lalow v. Codomo*, 101 So. 2d 390, 393 (Fla. 1958) ("The intention of the parties must be determined from an examination of the whole contract and not from the separate phrases or paragraphs. Further, the actions of the parties may be considered as a menas [sic] of determining the interpretation that they themselves have placed upon the contract.") (internal citation omitted).

"Where the terms of a written agreement are in any respect doubtful or uncertain, or if the contract contains no provisions on a given point, or if it fails to define with certainty the duties of the parties with respect to a particular matter or in a given emergency, and the parties to it have, by their own conduct, placed a construction upon it which is reasonable, such construction will be adopted by the court, upon the principle that it is the duty of the court to give effect to the intention of the parties where it is not wholly at variance with the correct legal interpretation of the terms of the contract." *Blackhawk Heating & Plumbing Co., Inc. v. Data Lease Fin. Corp.*, 302 So. 2d 404, 407 (Fla. 1974) (citation omitted). Moreover, in the construction of written contracts, "it is the duty of the court, as near as may be, to place itself in the situation of the parties, and from a consideration of the surrounding circumstances, the occasion, and apparent object of the parties,

to determine the meaning and intent of the language employed." *Id.* (citation omitted). Against this backdrop, the Court considers the Eleventh Circuit's Mandate indicating that the *expressio unius* doctrine may apply. *See* ECF No. [190].

Through this lens, the Court will interpret the scope of the restrictions contained in paragraphs 4 and 5 of the Settlement Agreement.

As a preliminary matter, the language at issue is found in the Settlement Agreement achieved by the parties after a full mediation that settled all claims. The context of the dispute leading to the Settlement Agreement involved a breakdown of relations between Kukreja, Circuitronix's CEO, and Kapoor, Circuitronix's former assistant CEO stemming from Kapoor's employment and role in Circuitronix. Paragraphs 3, 4, and 5, which Circuitronix alleges Kapoor breached, are all contained within a section of the Settlement Agreement titled "Restrictive Covenants." ECF No. [53]. Paragraph 3 provides that Kapoor "shall not . . . compete with Circuitronix, anywhere in the world" and that Kapoor "acknowledges that this restriction applies to all lines of business in which Circuitronix engaged during the time period Defendant was employed by Circuitronix[.]" *Id.* at ¶ 3. Paragraphs 4 and 5, however, do not expressly include the "lines of business" language from paragraph 3. *See id.* at ¶ 4 (Kapoor shall not "solicit, recruit, or attempt to hire any . . . agent of Circuitronix or any of its vendors, customers or affiliates"); *id.* at ¶ 5 (Kapoor shall not "have any contact, that he initiates and/or was planned, with any suppliers, customers or employees of Circuitronix").

Based upon the Court's prior construction of that term and in view of governing interpretive guidelines, two reasonable interpretations of the scope of paragraphs 4 and 5 arise. The first, relying upon *expressio unius*, adopts a strict and isolated reading of paragraphs 4 and 5 to reflect that that Kapoor could not solicit, recruit, or attempt to hire any of Circuitronix's customers in general nor could Kapoor have any contact with any of Circuitronix's customers

generally. *See N.L.R.B. v. S.W. Gen., Inc.*, 137 S. Ct. 929, 940 (2017) (explaining that "[t]he force of any negative implication . . . depends on context" and that the canon "applies only when 'circumstances support[] a sensible inference that the term left out must have been meant to be excluded'"); *see also Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (stating that *expressio unius* "does not apply to every statutory listing or grouping; it has force only when the items expressed are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence"). The second interpretation adopts a broader reading of paragraphs 4 and 5 based on the context of the restrictive covenants and their physical placement directly behind paragraph 3, and impliedly incorporates the "lines of business" language to reflect that Kapoor could not solicit, recruit, or attempt to hire any of Circuitronix's customers so long as the contact involved Circuitronix's lines of business (i.e., the manufacture and distribution of PCBs and PCBAs as stand-alone, finished products) nor could Kapoor have any contact with any of Circuitronix's customers if it involved Circuitronix's lines of business. *See United States v. Castro*, 837 F.2d 441, 442-43 (11th Cir. 1988) (explaining that the doctrine of *expressio unius* "has its limits" and cannot apply when the legislative history and context are contrary to a reading using that tool of construction).

The Court finds each of these interpretations to be reasonable under the circumstances. Although the "lines of business" verbiage is not expressly replicated, the scope of paragraphs 4 and 5 is not so clear and unambiguous that the Court can firmly conclude that the parties intended the "lines of business" restriction to apply only to paragraph 3. For example, if Kapoor was not permitted to have any contact whatsoever with any Circuitronix customer or supplier (paragraph 5), the restriction on Kapoor operating a competing business restricted only as to Circuitronix's lines of business (paragraph 3) would be largely duplicative and surplusage. The Court, therefore, chooses to examine extrinsic evidence to help determine the parties' intent behind the scope of

paragraphs 4 and 5.  *See, e.g.*, *Walsh v. Walsh*, 262 So. 3d 212, 216 (Fla. 5th DCA 2018) ("When a contract is unambiguous and clear, it must be interpreted in accordance with its plain meaning. If, however, a contract is reasonably susceptible to more than one interpretation, it is ambiguous. In that instance, the issue of proper interpretation of the ambiguous contract is a question of fact requiring the submission of extrinsic evidence to show the intent of the parties when the contract was drafted.") (internal citations omitted); *Barnett v. Destiny Owners Ass'n, Inc.*, 856 So. 2d 1090, 1092 (Fla. 1st DCA 2003) ("If the contract is ambiguous, the trial court should construe the contract and consider parol evidence to determine the parties' intent.").   In this regard, Circuitronix's counsel's arguments before the Court at the hearing on December 8, 2016, on the parties' cross-motions to enforce the Settlement Agreement, ECF No. [76], are particularly instructive.

During the hearing, when questioned by the Court regarding Circuitronix's claim that Kapoor was operating a business that directly competes with Circuitronix, counsel affirmed that paragraph 3 was violated and that "there may also be a violation of Paragraphs 4 and 5 of the Settlement Agreement," and he stated that the parties' Joint Stipulation, ECF No. [48], "fleshes out some of this information."  *See* ECF No. [76] at 10:7-24.  The Joint Stipulation provides that "[p]ursuant to the Parties' Settlement Agreement, Kapoor shall not, directly or indirectly, engage in any line of Circuitronix's business, including within the scope of his work with [BMTM]."  ECF No. [48] at ¶ 1.  When further pressed where the Court would find Circuitronix's claim for violation of paragraph 4, Circuitronix's counsel directed the Court to page 6 of its cross-motion.  *See* ECF No. [76] at 10:25-11:12.  That portion of the cross-motion expressly cited paragraphs 2 through 6 of the Settlement Agreement to represent that the "Restrictive Covenants prohibit Kapoor from engaging, directly or indirectly, in any line of Circuitronix's business."  ECF No. [55] at 6. It also referred to the Joint Stipulation, ECF No. [48], to support this statement.

Circuitronix's counsel, moreover, advised the Court that the facts that support the alleged violation of paragraph 4 of the Settlement Agreement were related to the products advertised on the Imaginasian Website and were reflected beginning on page 7 of its cross-motion. *See* ECF No. [76] at 11:13-14:15; 12:15-14:6. That section of the cross-motion specifically represented that the Imaginasian Website advertised product lines that "are in Circuitronix's line of business" and that Kapoor "is bound not to engage in the same mechanical metal parts business as Circuitronix" nor "to engage in any PCB business." ECF No. [55] at 8-9.

Most importantly, counsel advised the Court that Circuitronix's "position is that by advertising the same products that Circuitronix sells, advertising products that are in the same line of business, that that constitutes a solicitation of customers, vendors, suppliers, and others of Circuitronix" and "would implicate Paragraph 4." *See* ECF No. [76] at 11:24-12:5. *See also id.* at 13:16-14:3 ("[W]e've carefully detailed the advertising that appears on the Imaginasian website. This advertising is for the same products that Circuitronix sells. These are products that Mr. Kapoor, indirectly or directly, as an affiliate, agent, officer, anything else, is prohibited from engaging with. These advertisements appear on the website. They are directed to everyone, including Circuitronix's customers, suppliers, and everybody else because it's in the same line of business. And this is public advertising. It's on the Internet. So our position is that that is a solicitation of Circuitronix's customers, vendors, and others that are included in Paragraph 4, and would be a violation of Paragraph 4.").

Regarding paragraph 5, counsel informed the Court that although it does not have any direct evidence of a violation, in reference to the Imaginasian Website, Circuitronix has evidence of "a website that's advertising the same kinds of products, that talks about sending personnel into China to conduct RFQs and other things," and thus Circuitronix "believe[s]" that there is evidence that paragraph 5 is violated. *See id.* at 12:6-14. Counsel also advised the Court that paragraph 5's

alleged violation was based on the Imaginasian Website and Circuitronix's concerns about Kapoor operating a competing business. *See id.* at 14:16-15:8 (explaining that Circuitronix's evidence is circumstantial and "based on the information that's on the website indicating that they're advertising the same products and some of this other information indicating that they are operating a competing business").

Upon review and consideration, the Court finds that the intent behind the scope of paragraphs 4 and 5 of the Settlement Agreement was for those paragraphs to be read in conjunction with paragraph 3 and with implied reference to the "lines of business" restriction contained in paragraph 3. The Court, thus, concludes that the *expressio unius* doctrine does not apply to the interpretation of the contract provisions at issue. Circuitronix's interpretation of paragraphs 4 and 5, as represented to the Court, focused on Kapoor's alleged competition in the same lines of business as Circuitronix and its advertising of the same products as Circuitronix. Circuitronix's stance was founded largely on the Imaginasian Website's content, which advertised products and services that, in Circuitronix's impression, violated the restrictive covenants. Accordingly, the Court concludes that as a matter of pure contract interpretation, under the Settlement Agreement Kapoor was allowed to solicit or contact Circuitronix's vendors, customers, or affiliates (paragraph 4) or to contact its suppliers, customers, or employees (paragraph 5) so long as it did not involve the production of PCBs and PCBAs as stand-alone, final products.

### B. The evidence does not show that Kapoor breached paragraphs 4 or 5

Under the Court's interpretation of paragraphs 4 and 5 as set forth above, it does not find a basis to disturb its prior conclusion from the Relief Order, ECF No. [164], that Circuitronix failed to provide any evidence of a transaction or solicitation involving the sale of PCB or PCBA by Ei EMS. *Id.* at 2.

Of particular relevance to the Court's present analysis following the Mandate, the Reply provided evidence that, according to Circuitronix, showed that Kapoor was "directly involved in soliciting customers, including customers of Circuitronix." *Id.* at 6. For instance, Circuitronix produced an email from Kapoor to Bischoff and Vijay Gujarathi dated September 14, 2016 with the subject line "[p]otential companies we should target in India[,]" which list included Jabil, Honeywell, and UTC. *See* ECF No. [148-7].[8] Kapoor remarked in the email that they should "start getting key contacts" for each of these companies and that he wanted to plan a trip to India to meet with Bischoff and Gujarathi and all of the companies. *Id.* The Reply also included an email chain from March 2018 between Kapoor and Bischoff that attached a proposed memorandum of understanding that listed various clients of Ei EMS, ECF No. [148-5], including Emerson, also a client of Circuitronix while Kapoor was employed with Circuitronix. ECF No. [148-1]. Similarly, the Reply included a 2016 spreadsheet prepared by Kapoor, titled "Prospect List," ECF No. [148-33], which listed the following entities: Centrum, Honeywell, Leviton, Methode, Johnson Control, Jabil, Kimball, Firstronics, Eaton, Emerson, EBW, Lear, Odelo, Marquardt, and Yazaki, Circuitronix's clients while Kapoor was employed at Circuitronix. *See* ECF Nos. [148-33], ECF No. [148-1].[9] Circuitronix further maintained that Kapoor had direct contact with each of these customers during his tenure with Circuitronix and that, in certain instances, the contact person listed in the Ei EMS documents is the same contact person that he

---

[8] Kukreja's Declaration included these three companies among Circuitronix's customers during the period that Kapoor was employed at Circuitronix. *See* ECF No. [148-1].

[9] Kukreja's Declaration stated that Kapoor was responsible for developing Circuitronix's business with these companies and that "[t]here are records of his direct communication with these customers." ECF No. [148-1] at ¶ 7. These companies, however, are not reflected as Circuitronix's customers in Kukreja's Declaration. *Id.* at ¶ 2. The Kukreja Declaration separately notes that there are "significant records of communication and in person meetings by Sunny Kapoor during his employment with Circuitronix with each of the contacts listed in the 'Prospect List' provided by [] Bischoff and attached to his Declaration." *Id.* at ¶ 8.

26

dealt with while working for Circuitronix. ECF No. [148] at 6. This evidence, according to Circuitronix, established that Kapoor violated the non-solicitation provisions in the Settlement Agreement, *id.*, and showed that "Kapoor solicited the customers of Circuitronix and was directly involved in an ongoing competitive business." *Id.* at 9. The Court does not agree.

This evidence does not show that it was more likely than not that Kapoor violated paragraphs 4 and 5. The documents simply reflect prospect lists and companies that Kapoor desired to engage in business. However, nowhere does the evidence establish any actual contact, communication, solicitation or recruiting of any Circuitronix client in general nor whether such proposed contact was to be made with the intention of competing in Circuitronix's line of business. Thus, like the presentation of information on the Imaginasian Website, the mere fact that Kapoor had Circuitronix's client names or information relevant to Circuitronix's business is not dispositive when unaccompanied by corroborating evidence showing Kapoor took any prohibited action in response to that information. Therefore, Circuitronix has failed to supply sufficient evidence supporting a breach of those contract provisions.

### C. Relief under Rule 60(b)(3) is not warranted

#### i. *Legal standard*

Under Rule 60(b)(3), a court is empowered to relieve a party from a final judgment, order, or proceeding for fraud, misrepresentation, or misconduct by an opposing party. To do so, the movant must "prove by clear and convincing evidence that the adverse party obtained the [judgment] through fraud, misrepresentation or other misconduct." *Cox Nuclear Pharmacy, Inc. v. CTI, Inc.*, 478 F.3d 1303, 1314 (11th Cir. 2007) (brackets removed) (citing *Frederick v. Kirby Tankships, Inc.*, 205 F.3d 1277, 1287 (11th Cir. 2000)). The movant must also show that the conduct prevented the losing party from fully and fairly presenting his case or defense. *Id.* (citing *Frederick*, 205 F.3d at 1287). Rule 60(c), moreover, provides that a motion under Rule 60(b)(3)

must be made within a reasonable time and no more than a year after the entry of the jurdgment or order or the date of the proceeding. The Court enjoys considerable discretion in determining whether to grant relief pursuant to Rule 60(b)(3). *Scutieri v. Paige*, 808 F.2d 785, 794 (11th Cir. 1987). In any event, "a Rule 60(b) motion cannot substitute for an appeal." *Id.* (citing *Fackelman v. Bell*, 564 F.2d 734, 735 (5th Cir. 1977)).

### ii.     *Circuitronix fails to carry its burden*

The parties dispute whether the Motion and Reply present "new evidence" or "supplemental evidence." *Compare* ECF No. [145] at 3 *with* ECF No. [147] at 1. Regardless of the title, the Court finds that the evidence falls short of the considerable burden Circuitronix carries to obtain relief under Rule 60(b)(3).

First, the Court agrees with Kapoor that Circuitronix has not provided evidence that Kapoor—through Ei EMS or Imaginasian—has violated paragraph 3 of the Settlement Agreement. Although the Motion and Reply stress that Kapoor lied under oath, made material misrepresentations, and engaged in a ploy to mislead the Court, the Court nevertheless attributed these companies' actions to Kapoor but still found that Kapoor did not encroach upon Circuitronix's line of business. *See* ECF No. [110] at 13, 17. Circuitronix's production of evidence showing that Kapoor was more involved in these companies' affairs than what was initially represented does not provide a basis to set aside the Final Order.

Second, Circuitronix has not provided any direct evidence that Kapoor violated the Settlement Agreement, whether it be paragraphs 3, 4, or 5. Circuitronix's evidence, primarily the Bischoff Declaration, calls into question Kapoor's credibility and the veracity of his representations made to the Court. However, Circuitronix failed to produce evidence that Kapoor competed with Circuitronix in its lines of business or that Kapoor violated the restrictions under paragraphs 4 and 5, as those provisions have been interpreted. Indeed, Circuitronix does not

provide evidence of any transaction, solicitation, or contact involving the sale and manufacture of PCBs or PCBAs as final products.

Third, Circuitronix waited nearly the entire one-year time period set forth in Fed. R. Civ. P. 60(c)(1) to file the Motion. This is particularly significant because the record establishes that Circuitronix was aware of Bischoff prior to the final hearing and could have, but did not, call him to testify before the Court issued the Final Order. *See* ECF No. [101] at 170:22-171:5. The Motion, moreover, was filed forty days after Bischoff signed the Bischoff Declaration on June 29, 2018, nearly ten and a half months after the Final Order was entered on August 10, 2017. Yet, despite the benefit of nearly one entire year to produce evidence to support its case, Circuitronix reasserts arguments previously rejected by the Court and, in effect, requests the Court to reconsider its prior rulings because of Kapoor's alleged untruthfulness. In these circumstances, relief under Rule 60(b)(3) is not merited as the Motion was not brought within a reasonable time. *See Leon v. M.I. Quality Lawn Maint., Inc.*, No. 10-20506-CIV, 2018 WL 6250529, at *4-5 (S.D. Fla. Nov. 29, 2018) (denying motion for relief under Rule 60(b)(3) because motion was not made within a reasonable time where it was filed nine months after final judgment where the "newly" discovered evidence did not "unearth" new, previously unknown acts of perjury but rather confirmed what defendants had believed at the time of trial and at the time of entry of the final judgment, defendants had sufficient information to believe that plaintiff was untruthful in his deposition prior to trial, and it was unclear why defendants did not seek relief sooner than nine months after the final judgment) (collecting cases).

In sum, neither the Motion nor the Reply provide clear and convincing evidence of fraud, misrepresentation, or other misconduct that would justify relief from the Final Order.

### III.     CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Plaintiff, Circuitronix's LLC's,

Motion for Relief from Final Order, **ECF No. [145]** is **DENIED.**

**DONE AND ORDERED** in Chambers at Miami, Florida, on February 21, 2020.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record